KATHRYN C. WANNER (Cal. Bar No. 269310)
Email: wannerk@sec.gov
PATRICIA PEI (Cal. Bar No. 274957)
Email: peip@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
Gary Y. Leung, Associate Director
Douglas M. Miller, Supervisory Trial Counsel
444 S. Flower Street, Suite 900
Los Angeles, California 90071
Telephone: (323) 965-3998
Facsimile: (213) 443-1904

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | Case No. 2:25-cv-10026 |
| Plaintiff, | **COMPLAINT** |
| vs. | |
| SHILOH LUCKEY, | |
| Defendant. | |

Plaintiff Securities and Exchange Commission ("SEC") alleges:

## JURISDICTION AND VENUE

1. The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1) and 22(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77t(b), 77t(d)(1) & 77v(a), and Sections 21(d)(1), 21(d)(3)(A), 21(e) and 27(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78u(d)(1), 78u(d)(3)(A), 78u(e) & 78aa(a).

2. Defendant has, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national

securities exchange in connection with the transactions, acts, practices and courses of business alleged in this complaint.

3. Venue is proper in this district pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Section 27(a) of the Exchange Act, 15 U.S.C. § 78aa(a). because certain of the transactions, acts, practices and courses of conduct constituting violations of the federal securities laws occurred within this district. In addition, venue is proper in this district because Defendant Shiloh Luckey ("Luckey") resides in this district.

## SUMMARY

4. Since in or about October 2020 through September 2023, Shiloh Luckey ("Luckey"), founder and CEO of technology startup ComplYant App, Inc. ("ComplYant"), fraudulently raised over $13 million from venture capital investors using false claims about both the commercial success of ComplYant's software product as well as her own qualifications to lead the company.

5. ComplYant was an online technology company that offered an online software service for small business owners to track and manage their tax obligations. To lure investors into the fraudulent scheme, Luckey consistently and vastly overstated both ComplYant's revenue and the number of subscribers to the company's service. For example, among other false and misleading statements, Luckey told investors that from November 2020 to September 2022, ComplYant's revenue from customers subscribing to its tax management software had grown from just over $2,500 per month to more than $250,000 each month. In reality, during that time the company never made more than $510 in a single month and struggled to retain what few customers it did have.

6. Luckey also misrepresented herself to investors as a licensed Certified Public Accountant ("CPA"), with deep experience in tax management, supervision, and accounting compliance, falsely heightening investors' perception of her relevant expertise. However, Luckey was not a licensed CPA, nor do any records suggest she

ever was licensed.

7. In addition, on top of her salary from ComplYant, Luckey, for her own benefit, profited by at least $2.2 million of the investor funds raised. Luckey used ComplYant's funds for personal expenses including: travel to locations such as Aspen, Miami Beach, Turks and Caicos, and Lisbon; Super Bowl tickets; Luckey's destination wedding in the Caribbean; and the purchase of a personal car and Luckey's residence.

8. Luckey's fraudulent scheme eventually collapsed in mid-September 2023 when ComplYant ran out of cash and abruptly ceased operations, despite raising $750,000 from two new investors in June and September of 2023.

9. By engaging in this conduct, defendant Luckey violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)] and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

10. With this complaint, the SEC seeks permanent injunctions prohibiting future violations of the federal securities laws, an officer and director bar, and an order requiring defendant Luckey to disgorge her ill-gotten gains with prejudgment interest thereon in accordance with Section 21(d)(5) of 21(d)(7) of the Exchange Act [15 U.S.C. §§ 78u(d)(5) and 78u(d)(7)] and imposing civil penalties under Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)] and Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)].

## THE DEFENDANT

11. **Shiloh Luckey**, **f.k.a. Shiloh Johnson**, age 41, resides in Inglewood, California. She is the founder and Chief Executive Officer of ComplYant.

## RELEVANT ENTITY

12. **ComplYant App, Inc.**, was a Delaware corporation headquartered in Los Angeles, California, that offered an online software service for small business owners to track and manage their federal, state, and local tax obligations. ComplYant

1  ceased its operations around September 2023, and as of March 1, 2025, was no longer
2  in existence under Delaware law.  ComplYant was managed solely by Luckey, who
3  was the only officer for the company, and was not registered with the United States
4  Securities Commission in any capacity.

## THE FRAUD

**A.   ComplYant was Created and Controlled by Luckey**

13.   Formed in 2019, ComplYant was a technology startup run by its founder and CEO, Luckey.

14.   At its peak, in or around June 2023, ComplYant had over 50 employees.

15.   Although ComplYant eventually had a management team, comprising the heads of its various departments, Luckey was the company's only officer and executive.

16.   Luckey was also solely responsible for ComplYant's finances and was the only signatory on the company's bank accounts.

17.   At investor and board meetings, Luckey was the spokesperson for ComplYant.

**B.   ComplYant Raises $13.3 Million from Investors**

18.   In the summer of 2020, ComplYant first came to the attention of potential investors when Luckey participated in a technology accelerator program run by a Los Angeles–based non-profit.  This accelerator program offered education, mentorship, and networking opportunities to early-stage businesses like ComplYant.

19.   Through the technology accelerator program Luckey met a managing director of that program, who was at the time in the process of founding his own venture capital firm ("VC Investor 1").  This managing director was impressed by Luckey and her company and introduced her to a contact at another venture capital firm ("VC Investor 2").

20.   On or about August 25, 2020, Luckey met with VC Investor 2 and pitched ComplYant's business proposal to the firm as a possible investment.  During

that presentation, Luckey described her background, how she created ComplYant, and the specific business problems ComplYant intended to solve for its customers.

21. Specifically, during this August 25, 2020 meeting, Luckey presented herself as a licensed CPA, and explained that due to her background as a CPA she had discovered the problems that ComplYant intended to solve for its customers.

22. Ultimately, VC Investor 2 decided to invest $100,000 in ComplYant, and signed a convertible equity agreement with the company on or about October 22, 2020.

23. In the first year following VC Investor 2's initial investment, ComplYant continued to attract investments from various venture capital firms through Luckey's networking efforts, including enrollment in another startup accelerator program in the summer of 2021.

24. ComplYant raised almost $1.2 million between November 2020 and October 2021 through a combination of convertible equity agreements and simple agreements for future equity ("SAFEs"), signed on behalf of ComplYant by Luckey, including two investments from VC Investor 1 and an additional investment from VC Investor 2.

25. In December 2021, ComplYant entered into a series of stock purchase agreements to raise $4 million in another round of funding led by another venture capital firm ("VC Investor 3"). As a result of that funding round, a partner from VC Investor 3 took a seat on ComplYant's board of directors.

26. At quarterly board meetings, Luckey continued to keep investors apprised of the company's progress, including presenting detailed slideshows to the other board member and representatives of ComplYant's investors.

27. Luckey also provided occasional email updates to investors regarding ComplYant's progress.

28. As one example, on or about January 7, 2022, Luckey emailed investors her "monthly" update, claiming that ComplYant had $88,000 in monthly recurring

revenue, $6,000 in new monthly recurring revenue, 244 new registered users, and 89 new subscribers.

29. On or about May 16, 2022, Luckey again contacted investors by email in an investor update, claiming that ComplYant now had revenue of $179,724, new monthly revenue of $9,000, 391 new registered users, and 127 new subscribers over the past month, with a bank balance of almost $3.5 million.

30. In October 2022, ComplYant conducted another round of financing, raising an additional $7.3 million through SAFEs, signed on behalf of ComplYant by Luckey, with investors that included VC Investor 1, VC Investor 2, and VC Investor 3.

31. Finally, in June and September 2023, ComplYant entered into SAFEs, signed on behalf of ComplYant by Luckey, for another $750,000 from two new investors. The company ran out of cash and abruptly ceased operations in mid-September 2023.

**C.   ComplYant's Actual Operations**

32. ComplYant purported to offer an online tax management platform for small to medium businesses.

33. ComplYant's business model was subscription-based; customers who registered to use the product could choose between several tiers of service depending on their needs and would be charged a recurring fee for access to its offerings. Although the lowest-tier ComplYant account was free, the company's business model was based on either signing up paying users or converting free users to paid membership levels.

34. Subscription fees from customers were the only source of revenue throughout ComplYant's operations.

35. ComplYant did develop and offer a tax management service. ComplYant did attract some customers willing to pay for a subscription. However, the company never had more than 131 paying customers in total over its lifetime, and

never achieved more than $620 in monthly revenue.

**D.     Luckey's False Representations to Investors**

    **1.     Luckey Dramatically Overstated ComplYant's Revenue**

36. Following the initial investment by VC Investor 1 in October 2020, Luckey provided a series of written materials to current and prospective investors, including pitch decks, financial statements and projections, investor update emails, and board meeting presentations.

37. Each of these painted an increasingly rosy picture of ComplYant's business performance: alleged monthly revenues reportedly grew from around $2,500 in November 2020, to over $220,000 by August 2022.

38. For example, October 2022, to at least one prospective investor, Luckey reported that ComplYant had annual recurring revenue of $3.1 million (implying approximately $258,333 of monthly revenue) as of September 2022.

39. Luckey personally presented these revenue and customer figures to ComplYant investors and affirmed their accuracy in both in-person and online meetings.

40. Investors in ComplYant were shown revenue numbers by Luckey depicting a company that was growing rapidly and exceeding expectations for typical startups at that stage. These reported revenues were central to investors' decisions to invest.

41. Luckey's claims to investors about ComplYant's ever-increasing monthly revenues were all false.

42. In reality, ComplYant was earning hardly any revenue from its online subscription product. For example, from November 2020 to September 2022, ComplYant's monthly subscription income averaged around $250, never exceeding $620 in a single month.

43. In total, the online payments made to ComplYant show that ComplYant received only the following approximate total yearly subscription payments, vastly

underperforming the revenue Luckey was claiming to investors:

        (a)    2020: $507

        (b)    2021: $3,167

        (c)    2022: $4,053

        (d)    2023: $4,653.

44. However, even as ComplYant's actual financial performance stalled at several hundred dollars a month in revenue, the company's representations to investors grew increasingly exaggerated, such that the magnitude of Luckey's overstatements continued to climb, as illustrated in the table below:

| ComplYant Monthly Revenues Contention vs. Reality (Exemplars) | | | |
|---|---|---|---|
| Month | ComplYant's Alleged Revenue | Actual Revenue (rounded to the nearest $) | Degree of Revenue Overstatement (multiple) |
| Jan. 2021 | $3,000 | $35 | 85x |
| Aug. 2021 | $41,000 | $323 | 127x |
| Dec. 2021 | $87,614 | $236 | 371x |
| Aug. 2022 | $221,040 | $247 | 895x |

45. In a virtual meeting in late 2023, after ComplYant's collapse, Luckey even admitted to two investor representatives that she had previously misstated ComplYant's financials.

46. Luckey's statements about ComplYant's ever-increasing revenue were critical to investors' decisions to invest or re-invest in the company.

47. Luckey's grossly inflated revenue numbers also meant ComplYant's other metrics of financial performance were overstated to match the claimed revenue amounts.

48.     In statements to investors, Luckey falsely inflated ComplYant's gross margin, burn (the amount by which expenses exceed revenue), and runway (how long a company can operate before it runs out of cash). All of these metrics were routinely presented to investors, and all were important to the investors' decisions to invest in ComplYant.

### 2. Luckey's False Statements About the Number of ComplYant Customers

49.     To sustain the fiction of astronomical revenue growth to her investors and prospective investors, Luckey also had to invent the customers that supposedly subscribed to and paid for ComplYant's product.

50.     For example, in June of 2021 in a presentation to a start-up accelerator program, Luckey claimed to have 929 subscribers with monthly recurring revenue of $27,434.

51.     In October of 2022, in an investment memorandum to another prospective investor, ComplYant was described having "4K + customers" with approximately $3.1 in annualized revenue.

52.     Luckey also claimed in that October 2022 investment memorandum that ComplYant was bringing in anywhere from 64 to 678 new paid subscribers each month.

53.     Moreover, Luckey also represented to investors that ComplYant was concurrently maintaining a low rate of customer turnover, known as churn, implying not only a continually expanding customer base, but also a high level of customer satisfaction with the product, which was a bullish indicator of the company's future success.

54.     For example, in a board meeting on or about July 28, 2022, at which investors were present, Luckey presented a chart of ComplYant's alleged customers, showing grown from zero to almost 3,500 customers, with almost no customer turnover. This chart was a fabrication:



55. According to ComplYant's actual online customer payment data, ComplYant had nowhere near the number of paid subscribers, nor the rate of subscription renewals that Luckey described to investors.

56. From December 2019 through October 2023, ComplYant never had more than 131 unique subscribers total.

57. In that same time period, more than half of ComplYant's actual customers initiated a paid account but then never incurred a second charge for ComplYant's services.

58. Between April 2020, when ComplYant's software first launched, and September 2023, when the company ceased operations, the company averaged fewer than 4 new subscribers per month.

### 3. Luckey Falsely Claimed to be a CPA

59. The written materials Luckey provided to investors and prospective

investors repeatedly touted Luckey's status as a licensed CPA, a fact that Luckey also emphasized when pitching ComplYant to prospective investors.

60. The fact that Luckey was allegedly a CPA was important to investors' decision to invest in ComplYant, as it was a good indicator of the depth of Luckey's expertise in the relevant field.

61. For example, VC Investor 2, who invested when the company was still "pre-revenue," relied heavily on Luckey's perceived qualifications as a CPA to develop ComplYant's product.

62. Even in an October 2022 "scorecard" prepared by a prospective investor in ComplYant, the investor described the importance of Luckey's qualifications as a CPA in the context of her efforts to found ComplYant, stating, "Shiloh is an accountant by trade, but clearly a hustler who has gotten the business to $3.1M in ARR (expected 4x YoY growth) as a solo founder with a team of mostly ICs."

63. Similarly, in 2020, VC Investor 2 described the importance of Luckey's CPA certification in the investment decision, "[a]s a practicing CPA and scholar in tax law, [Luckey] realized a unique opportunity to assist small business owners to understand relevant tax rules and requirements. Shiloh served 300 small business in Los Angeles as a career CPA."

64. In reality, Luckey was never licensed as a CPA in California or in any other state.

E. **Luckey Profited Directly in Connection with the Sale of ComplYant's Securities**

65. In addition to deceiving investors as to ComplYant's revenue and customer base and as to her certification as an accountant, Luckey also profited directly from the scheme by misappropriating investor funds for her own benefit.

66. By at least October 2020 , Luckey began routinely using ComplYant's company accounts for personal spending.

67. Using ComplYant's business accounts, Luckey paid approximately $2.2

million for her own personal expenses, for expenditures including:

    (a)    Approximately $137,000 in student loan repayment;

    (b)    Approximately $1.3 million on travel, entertainment, 2022 Super Bowl tickets, Rams football tickets, wedding expenses for a destination wedding, purchase of a car, and other personal expenses; and

    (c)    Approximately $739,000 to fund the purchase of Luckey's $1.1 million home.

### F. ComplYant Collapses Yet Luckey Continues to Promote Herself

68. In mid-September 2023 Luckey abruptly terminated ComplYant's operations, dismissing all of its employees.

69. However, Luckey has continued to promote her accounting expertise and her experience as an alleged tech startup founder on various websites.

70. At least as of mid-June 2025, Luckey was offering accounting services targeting "digital creators and small businesses" under a new business name, as well as claiming to provide a tax service aimed at teens.

71. Through 2025, Luckey has continued posting alleged tax advice videos on social media.

72. Through at least August 2024 Luckey regularly referred to herself in these tax advice videos as a licensed CPA.

73. Also in 2025, Luckey started a new social media account to document the alleged creation of a new app that on its face would have significant overlap with the business and tax services that ComplYant purported to provide.

### G. Luckey Acted with Scienter and Her Conduct was Negligent

74. Luckey acted with scienter in carrying out the scheme to defraud and in making the false and misleading statements to investors. Luckey also acted negligently in carrying out her scheme and in making the false and misleading statements, that is, she failed to exercise the level of care that a reasonable person

would have exercised under the same circumstances.

75. Luckey's scienter and failure to act reasonably under the circumstances is demonstrated, in part, by the following:

(a) As founder of ComplYant Luckey clearly had knowledge of, or was reckless in not knowing, the falsity of her statements regarding revenue, customers, and her own qualifications;

(b) Luckey had exclusive access to and control over ComplYant's financial information, including its bank statements, such that she would have all the information necessary to know her statements were false;

(c) Luckey admitted in late 2023 to an investor that she had falsified ComplYant's financials in information she had conveyed to investors.

**H.    The ComplYant Investments are Securities**

76. Investments in ComplYant were in three forms: (1) stock purchase agreements, (2) convertible equity agreements, or (3) simple agreements for future equity ("SAFEs").

77. Each of the three forms of investments in ComplYant are securities.

78. The stock purchase agreements were straightforward purchases of ComplYant stock and thus securities.

79. The convertible agreements and SAFEs granted the investors the right to a future ownership of stock upon the occurrence of certain events.

80. A reasonable investor would consider the ComplYant investments to be securities.

**FIRST CLAIM FOR RELIEF**

**Fraud in the Connection with the Purchase and Sale of Securities**

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5**

**(against Defendant Luckey)**

81. The SEC realleges and incorporates by reference paragraphs 1 through 80 above.

82. In connection with the purchase or sale of securities, Defendant Luckey employed deceptive acts and practices and engaged in a course of conduct to deceive investors in her offer and sale of ComplYant's securities. She did so by making, and then disseminating, materially false statements about ComplYant's revenues and number of subscribers, and about Luckey's status as an alleged CPA. Luckey created a vast collection of pitch decks, board presentations, spreadsheets, and charts, all purporting to show ComplYant's extraordinary growth and touting her own experience and credentials. She presented these materials at in-person and virtual meetings and widely shared them with actual and prospective investors. In reality, ComplYant had neither the revenue Luckey claimed nor the number of subscribers she touted, and Luckey was not a CPA.

83. By engaging in the conduct described above, Defendant Luckey, directly or indirectly, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

84. Defendant Luckey, with scienter, employed devices, schemes and artifices to defraud; made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and engaged in acts, practices or courses of conduct that operated as a fraud on the investing public by the conduct described in detail above.

85. By engaging in the conduct described above, Defendant Luckey violated, and unless restrained and enjoined will continue to violate, Section 10(b) of

the Exchange Act, 15 U.S.C. § 78j(b), and Rules 10b-5(a), 10b-5(b), and 10b-5(c) thereunder, 17 C.F.R. §§ 240.10b-5(a), 240.10b-5(b) & 240.10b-5(c).

## SECOND CLAIM FOR RELIEF

### Fraud in the Offer or Sale of Securities

### Violations of Section 17(a) of the Securities Act

### (against Defendant Luckey)

86. The SEC realleges and incorporates by reference paragraphs 1 through 80 above.

87. In connection with the purchase or sale of securities, Defendant Luckey employed deceptive acts and practices and engaged in a course of conduct to deceive investors in her offer and sale of ComplYant's securities. She did so by making, and then disseminating, materially false statements about ComplYant's revenues and number of subscribers, and about Luckey's status as an alleged CPA. Luckey created a vast collection of pitch decks, board presentations, spreadsheets, and charts, all purporting to show ComplYant's extraordinary growth and touting her own experience and credentials. She presented these materials at in-person and virtual meetings and widely shared them with actual and prospective investors. In reality, ComplYant had neither the revenue Luckey claimed nor the number of subscribers she touted, and Luckey was not a CPA.

88. By engaging in the conduct described above, Defendant Luckey, directly or indirectly, in the offer or sale of securities, and by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails directly or indirectly: (a) employed devices, schemes, or artifices to defraud; (b) obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

89. Defendant Luckey, with scienter, employed devices, schemes and artifices to defraud; with scienter or negligence, obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and, with scienter or negligence, engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

90. By engaging in the conduct described above, Defendant Luckey violated, and unless restrained and enjoined will continue to violate, Sections 17(a)(1), 17(a)(2), and 17(a)(3) of the Securities Act, 15 U.S.C. §§ 77q(a)(1), 77q(a)(2), & 77q(a)(3).

## PRAYER FOR RELIEF

WHEREFORE, the SEC respectfully requests that the Court:

### I.

Issue findings of fact and conclusions of law that Defendant Luckey committed the alleged violations.

### II.

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Luckey, and her officers, agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Section 17(a) of the Securities Act [15 U.S.C. §77q(a)], and Section 10(b) of the Exchange Act [15 U.S.C. §§ 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### III.

Issue judgments permanently prohibiting Luckey from serving as an officer or director of any company that has a class of securities registered under Exchange Act Section 12 [15 U.S.C. § 78l] or that is required to file reports under Exchange Act

Section 15(d) [15 U.S.C. § 78o(d)], pursuant to Securities Act Section 20(e) [15 U.S.C. § 77t(e)] and Exchange Act Section 21(d)(2) [15 U.S.C. § 78u(d)(2)];

IV.

Order Defendant Luckey to disgorge all funds received from her illegal conduct, together with prejudgment interest thereon, in accordance with Exchange Act Sections 21(d)(5) and 21(d)(7) [15 U.S.C. §§ 78u(d)(5) and 78u(d)(7)].

V.

Order Defendant Luckey to pay civil penalties under Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

VI.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

VII.

Grant such other and further relief as this Court may determine to be just and necessary.

Dated: October 20, 2025

/s/ Kathryn C. Wanner
Kathryn C. Wanner
Patricia Pei
Attorneys for Plaintiff
Securities and Exchange Commission